UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

EMMA SHIELDS-NORDNESS,

Plaintiff,

v.

OSCAR GALINDO, JEFFREY KORUS,
and VOSINICK KELLUM, in their
individual and official capacities as
St. Paul Police Officers; CITY OF SAINT
PAUL; JOHN DOES 1-5, in their
individual and official capacities as
Ramsey County employees; and
RAMSEY COUNTY,

Defendants.

Case No. 18-CV-1426 (PJS/DTS)

ORDER

Adam T. Johnson and David Reed Lundgren, LUNDGREN & JOHNSON,
PSC; Andrew M. Irlbeck, for plaintiff.

Kimberly R. Parker and Robert B. Roche, RAMSEY COUNTY
ATTORNEY'S OFFICE, for defendants.

Plaintiff Emma Shields-Nordness was arrested by St. Paul police officers and

transported to the Ramsey County Adult Detention Center ("ADC") after eyewitnesses

mistakenly identified her as the driver of a car that had been involved in a hit-and-run

accident. Shortly after arresting Shields-Nordness, the police received additional

information that caused them to doubt that she had anything to do with the accident,

and the police notified the ADC that Shields-Nordness could be released. At the time

that the police contacted the ADC, Shields-Nordness was still sitting in her street clothes in the facility's open-booking area, waiting for her background check to be completed.

Shields-Nordness was not released. Instead, she was detained in the open-booking area for two more hours, and then she was transferred into the general population of the ADC. Like every detainee transferred into the general population, Shields-Nordness was strip searched. After sitting in a cell for another three hours, Shields-Nordness was finally released.

Shields-Nordness filed this action under 42 U.S.C. § 1983 against the City of St. Paul, three of its police officers, the County of Ramsey, and unnamed employees of the ADC (identified as "John Does"). Shields-Nordness alleges that defendants violated her rights under the Fourth and Fourteenth Amendments and committed the tort of false imprisonment. Ramsey County and the ADC employees now move to dismiss all claims against them. For the reasons that follow, the Court grants their motion in part and denies it in part.

## I. BACKGROUND

### A. The Arrest

The amended complaint alleges the following:

On November 29, 2017, Shields-Nordness and her boyfriend (Braden Shannon) attended a concert in downtown St. Paul. They left the concert at about 11:30 pm and walked to a nearby restaurant to get something to eat. Am. Compl. ¶¶ 12, 14.

At about midnight, St. Paul police responded to a report of a hit-and-run accident near the concert venue. *Id.* at ¶¶ 15-16. The police obtained descriptions of the car and the driver that had been involved in the collision. *Id.* at ¶ 16. Officer Vosinick Kellum searched the vicinity of the accident and found a vehicle that matched the description of the car. *Id.* at ¶ 17. That vehicle had sustained substantial front-end damage. The driver of the vehicle appeared to have fled the scene. *See id.*

Several blocks away, Shields-Nordness and Shannon, having finished their meal, were walking to the parking ramp where they had left Shannon's vehicle. Officer Kellum spotted the couple and thought that Shields-Nordness seemed upset. *Id.* at ¶ 18. As Shannon drove out of the garage, Officer Kellum and Officer Oscar Galindo stopped his vehicle. *Id.* at ¶ 19. Officer Galindo asked to see Shields-Nordness's driver's license so that he could determine whether she was the registered owner of the vehicle that appeared to have been involved in the hit-and-run. After running a computer check, Officer Galindo learned that the car was not registered to Shields-Nordness. *Id.* at ¶¶ 20-21.

Officer Galindo nevertheless continued to question Shields-Nordness about the hit-and-run accident and falsely told her that the police had determined that her car had been involved in the accident. *See id.* at ¶¶ 21-27. The officers then brought the victims of the accident to the scene, made Shields-Nordness stand alone in the middle of the street with squad lights shining at her, and asked the victims if Shields-Nordness had driven the car that struck their vehicle. The victims identified Shields-Nordness as the driver. *Id.* at ¶ 27.

Shields-Nordness was arrested for driving while intoxicated and taken to the police station. *Id.* at ¶¶ 29-31, 50. At about 2:00 am, officers transported Shields-Nordness to the Ramsey County ADC. *See id.* at ¶¶ 54-55.

### B. Intake and Booking at the Ramsey County ADC

After arriving at the ADC, Shields-Nordness sat in the open-booking area in her street clothes and waited for the staff to complete a background check. *See id.* at ¶¶ 56, 69. In the meantime, St. Paul police continued to investigate the accident. An officer was able to locate Shields-Nordness's car, which was parked near Shannon's home in Minneapolis, right where Shields-Nordness told police she had left it. *See id.* at ¶¶ 25, 63. Also, Officer Galindo interviewed the registered owner of the vehicle at her home. *Id.* at ¶¶ 59, 63. The owner (who bore a physical resemblance to Shields-Nordness) told Officer Galindo that she had driven her car to downtown St. Paul that evening, drunk

alcohol to excess, and then taken a cab home. She claimed not to know where her car was. *Id.* at ¶ 59.

Based on this and other information, Commander Sean Johnson determined that Shields-Nordness should be released. Commander Johnson transmitted to the ADC a release-pending-further-investigation (or "RPFI") form, notifying the ADC that it could release Shields-Nordness. The ADC received the RPFI form no later than 3:15 am. *See id.* at ¶¶ 63-64, 70. A few minutes later, Shannon contacted the ADC and asked when Shields-Nordness would be released. In response, the ADC told Shannon that Shields-Nordness could not be released until her background check was completed. *Id.* at ¶ 69.

At about 5:00 am—or almost two hours after Commander Johnson authorized the release of Shields-Nordness—the ADC decided to move Shields-Nordness to the general population of the facility. Pursuant to ADC policies, a female guard took Shields-Nordness to a private room and told her to remove all of her clothes and place them in a crate. *Id.* at ¶¶ 75, 96. Shields-Nordness was then told to turn her back to the guard, squat, and cough. After completing the strip search, the guard told Shields-Nordness to put on a jail uniform. Shields-Nordness was then taken to a cell in the general population. *Id.* at ¶¶ 76-78. After being denied the opportunity to make a phone call and being told that she would be detained another 48 hours, Shields-Nordness began hyperventilating and vomited in her cell. *Id.* at ¶¶ 76-77.

At about 8:00 am, Shields-Nordness was told that she was being released.  A male guard led her to a holding cell with a one-way mirror, handed back her street clothes, and told her to change.  Shields-Nordness had to disrobe in front of other female inmates in the holding cell.  She did not know whether any male guard was looking through the one-way mirror as she changed.  Shields-Nordness was finally released at 8:51 am, more than five hours after Commander Johnson told the ADC that it could release her.  *Id.* at ¶ 78.

In this action, Shields-Nordness brings claims against the employees of the ADC who failed to release her but instead strip searched her and then incarcerated her with the general population, contending that those employees violated her rights under the Fourth and Fourteenth Amendments.  *Id.* at ¶¶ 87-93.  Shields-Nordness also seeks to hold Ramsey County liable for the constitutional violations because, she claims, Ramsey County maintains facially unconstitutional policies that require every person who is brought to the ADC to complete the full booking process—including being subject to a background check, fingerprinted, photographed, strip searched, and housed with prisoners in the general population—even if that person is ordered released in the course of the booking process.  *Id.* at ¶¶ 94-99.

## II.  ANALYSIS

### A.  Standard of Review

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Although the factual allegations in the complaint need not be detailed, they must be sufficient to "raise a right to relief above the speculative level."  *Id.* at 555.  In assessing the sufficiency of the complaint, the Court may disregard legal conclusions that are couched as factual allegations.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).  The Court must, however, accept as true the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  *See id.* at 678.

### B.  Merits

#### 1.  Section 1983 Claim against the ADC employees

Shields-Nordness has sued the ADC employees in their individual capacities for violating her rights under the Fourth and Fourteenth Amendments.  The ADC employees now move to dismiss Shields-Nordness's claims based on qualified immunity.

"A Rule 12(b)(6) dismissal based on qualified immunity is appropriate 'when the immunity is established on the face of the complaint.'"  *Dornheim v. Sholes*, 430 F.3d 919,

926 (8th Cir. 2005) (quotation omitted). "A government official is entitled to qualified immunity unless (1) the official violated a plaintiff's constitutional right and (2) that right was clearly established at the time of the violation." *Wallace v. City of Alexander*, 843 F.3d 763, 768 (8th Cir. 2016). The Court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The Court will first address the question of whether the ADC employees violated any right of Shields-Nordness that was clearly established as of November 30, 2017. "A right is clearly established if, at the time of the challenged conduct, 'every reasonable official would have understood that what he [was] doing violate[d] that right.'" *Wallace*, 843 F.3d at 769 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Qualified immunity analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quotation omitted). Although "[t]here does not need to be 'a case directly on point, . . . existing precedent must have placed the . . . constitutional question beyond debate.'" *Wallace*, 843 F.3d at 769 (quotation omitted).

Shields-Nordness alleges that the ADC employees violated her rights under the Fourth and Fourteenth Amendments when, after being told by Commander Johnson

that she could be released, they strip searched her and placed her into the general

population.[1]  As an initial matter, it is not clear whether Shields-Nordness has a

substantive-due-process claim, a Fourth Amendment claim, or both.  On the one hand,

the Eighth Circuit has repeatedly applied substantive-due-process analysis—and

refused to apply Fourth Amendment analysis—to claims similar to Shields-Nordness's.

*See, e.g., Golberg v. Hennepin Cty.*, 417 F.3d 808, 810-11 (8th Cir. 2005); *Luckes v. Cty. of

Hennepin*, 415 F.3d 936, 939 (8th Cir. 2005); *Killingham v. Cty. of Hennepin*, 152 F. App'x

554, 555 n.1 (8th Cir. 2005).  On the other hand, the Supreme Court's recent decision in

*Manuel v. City of Joliet*, 137 S. Ct. 911 (2017), suggests that Shields-Nordness has a claim

under the Fourth Amendment.  According to *Manuel*, "[i]f the complaint is that a form

of legal process resulted in pretrial detention unsupported by probable cause, then the

right allegedly infringed lies in the Fourth Amendment."  *Id.* at 919.

Ultimately, the Court need not determine whether Shields-Nordness has a

substantive-due-process claim, a Fourth Amendment claim, or both, because the Court

---

[1]Shields-Nordness also complains about her initial detention and arrest by
St. Paul police.  But no employee of Ramsey County was involved in those decisions.
*See Grayson v. Ross*, 454 F.3d 802, 809-10 (8th Cir. 2006) (extending qualified immunity to
an official "not involved in the decision" that allegedly violated the plaintiff's rights).
Shields-Nordness also claims that the ADC's failure to release her immediately after it
received the RPFI form from Commander Johnson violated her constitutional rights.  As
explained below, however, that claim is meritless in light of a long line of Eighth Circuit
decisions rejecting similar "over-detention" claims.  These claims are dismissed with
prejudice insofar as they are asserted against the Ramsey County defendants.

concludes that the ADC employees have qualified immunity against any claim that their actions violated any constitutional right of Shields-Nordness.  The starting point for the Court's analysis is *Florence v. Board of Chosen Freeholders*, in which the Supreme Court squarely held that a detention facility such as the ADC may, consistent with the Fourth Amendment, subject every detainee who is admitted into the general population of the facility to a visual strip search of the type experienced by Shields-Nordness.  566 U.S. 318 (2012).  The Supreme Court did not address the issue of substantive due process, but if a strip search of a detainee who is being transferred to the general population is reasonable for purposes of the Fourth Amendment (as the Court held), then that same strip search is obviously not "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998).[2]

It is thus absolutely clear that, *if* the ADC acted constitutionally in transferring Shields-Nordness to the general population, it also acted constitutionally in subjecting her to a strip search.  The question, then, is whether the ADC employees violated a

_____

[2]A plaintiff states a substantive-due-process claim by plausibly alleging that a government official (1) violated a fundamental right (2) by engaging in conscience-shocking conduct.  *Akins v. Epperly*, 588 F.3d 1178, 1183 (8th Cir. 2009); *see Norris v. Engles*, 494 F.3d 634, 637-38 (8th Cir. 2007) ("To establish a violation of an individual's substantive due process rights, the 'plaintiff must demonstrate *both* that the official's conduct was conscience-shocking, *and* that the official violated one or more fundamental rights . . . .'" (cleaned up)).

clearly established constitutional right of Shields-Nordness when they transferred her to the general population.

In *Florence*, eight of the nine justices stressed that the Court was not addressing whether or to what extent the Constitution limits the ability of the government to admit a detainee into the general population of a detention facility. Justice Kennedy wrote the Court's opinion for a five-justice majority; in a small portion of the opinion that was joined by only four Justices, Justice Kennedy made clear that the Court was leaving open the question "whether an arrestee whose detention has not yet been reviewed by a magistrate or other judicial officer, and who can be held in available facilities removed from the general population" may be transferred to the general population and thus strip searched. *Id.* at 339 (plurality opinion). In his concurrence, Justice Alito emphasized "that the Court does not hold that it is *always* reasonable to conduct a full strip search of an arrestee whose detention has not been reviewed by a judicial officer and who could be held in available facilities apart from the general population." *Id.* at 341 (Alito, J., concurring). Justice Alito explained that for "[m]ost of those arrested for minor offenses . . . admission to the general jail population, with the concomitant humiliation of a strip search, may not be reasonable, particularly if an alternative procedure is feasible." *Id.* at 341-42. In a separate concurrence, Chief Justice Roberts largely agreed with Justice Alito. *Id.* at 340 (Roberts, C.J., concurring). And the four

dissenting justices—quoting Justice Alito—agreed that "it remains open for the Court to consider whether it would be reasonable to admit an arrestee for a minor offense to the general jail population, and to subject her to the 'humiliation of a strip search,' prior to any review by a judicial officer." *Id.* at 355 (Breyer, J., dissenting).

In short, the very question that confronted the ADC employees at the time that they dealt with Shields-Nordness in 2017—what limitations did the Constitution place on their ability to admit Shields-Nordness into the general population and thereby subject her to a strip search—was expressly left open by the Supreme Court in 2012. Subsequent to *Florence*, neither the Supreme Court, nor the Eighth Circuit, nor this Court have addressed that question. The sparse post-*Florence* authority from outside of the Eighth Circuit is in some tension. In 2013, the Eleventh Circuit squarely rejected the notion that a detainee in the position of Shields-Nordness has a constitutional right not to be placed in the general population:

> . . . Plaintiffs do not dispute they entered or reentered the general Jail population after these strip searches. Rather, what Plaintiffs are in effect saying is that they should not have been taken back into the general Jail population but they should have been segregated in a separate holding area in the Jail while all of the release process procedures took place, such as waiting for the court paperwork to be sent to the Jail, the Jail employees' then checking for warrants and holds, and having any personal items located and returned. Plaintiffs' challenge is really to the decision to place them in the general Jail population. However, there is no constitutional right, much less a clearly established one, to

be held in a particular cell or a separate area of a Jail and not
be placed back in the general Jail population.

*Powell v. Sheriff, Fulton Cty.*, 511 F. App'x 957, 964 (11th Cir. 2013).

By contrast, a district judge in the District of Columbia held that representatives

of a putative class of detainees had pleaded a viable Fourth Amendment claim against a

jail that had stripped searched them and placed them in the general population. *See*

*Lewis v. District of Columbia*, 195 F. Supp. 3d 53 (D.D.C. 2016). The plaintiffs had been

arrested for driving while impaired and taken before magistrate judges for detention

hearings. *Id.* at 56-57. Those hearings had been continued to the next day to give the

government an opportunity to correct errors in the affidavits that it had submitted in an

attempt to establish probable cause. The plaintiffs were then transported to the jail,

where they were strip searched as part of the intake process and placed in the general

population. *Id.* The plaintiffs alleged that their strip search and placement in the

general population violated the Fourth Amendment because there were "other readily

available facilities removed from the general population of the DC Jail" where they

could have been held. *Id.* at 64-65. The court found that plaintiffs' allegations fell

"squarely within circumstances not resolved by the Supreme Court in *Florence*" and

refused to dismiss their claim. *Id.* at 65. Instead, the court gave the plaintiffs an

opportunity "to engage in factual discovery" to demonstrate that the strip searches

were unconstitutional. *Id.*

Clearly, then, *Florence* and post-*Florence* decisions did not clearly establish that ADC employees acted unconstitutionally in admitting Shields-Nordness to the general population. And, indeed, Shields-Nordness does not argue to the contrary. Rather, her contention that she had a clearly established right not to be transferred to the general population relies entirely on an Eighth Circuit decision that predated *Florence*: *Young v. City of Little Rock*, 249 F.3d 730 (8th Cir. 2001).

In *Young*, the plaintiff (Young) was mistakenly arrested on a Saturday afternoon on a warrant that had been issued for her sister-in-law. She was admitted to the general population of a jail following a strip search. On Monday morning, she was taken to court, and a "municipal court judge determined that the wrong person had been arrested and ordered Ms. Young released." *Id.* at 732. Instead of releasing Young, however, a police officer returned her to a holding cell at the courthouse. Thirty minutes later, Young was chained to other female detainees, transported back to the jail, strip searched in front of a half dozen other people, readmitted to the general population, and held there for over two hours until her paperwork was completed. *Id.* at 736. A jury found that Young's rights had been violated both by being detained in the holding cell for 30 minutes (for which the jury awarded $35,000) and by being readmitted to the general population of the jail (for which the jury awarded $65,000). *Id.* at 733.

The Eighth Circuit affirmed the jury's awards. The Eighth Circuit said that a reasonable jury could have found that Young was deprived of substantive due process because "[t]he whole incident is shocking." *Id.* at 736. The Eighth Circuit elaborated only briefly:

> [T]he City could have had [Young] transported back to the jail without chaining her, and certainly there was no necessity whatever to strip search a person who was wholly innocent of any charge.

> . . . We grant that the amounts [of the verdicts] are high, but they are not so excessive as to be shocking. The liberty of the individual is at stake here. A citizen had been arrested, erroneously as it turned out, and a court had ordered her released. The court's order had not been followed. Instead, a process of administrative foot-dragging took place, characterized by gross indignities.

*Id.*

Shields-Nordness argues that, under *Young*, she had a clearly established right not to be transferred into the general population of the ADC. The Court disagrees. For a number of reasons, the Court finds that *Young* did not clearly establish that the ADC's transfer of Shields-Nordness into the general population violated her constitutional rights:

*First*, *Young* relied heavily on the fact that "a court had ordered [Young] released." *Id.* Here, no court had ordered the ADC or anyone else to release Shields-Nordness. Instead, an employee of the St. Paul police department notified an employee

-15-

of Ramsey County that Shields-Nordness could be released. It is one thing for an employee of a detention center to be ordered by a judge to release an arrestee; it is another thing for an employee of a detention center to be notified by a police officer that, as far as the police are concerned, the detainee can be released. *See Davis v. Hall*, 375 F.3d 703, 719 (8th Cir. 2004) (denying qualified immunity to jailers because the plaintiff had a clearly established right to be released from prison based on a court order); *Slone v. Herman*, 983 F.2d 107, 109-11 (8th Cir. 1993) (denying qualified immunity where the detainee had a clearly established right to release based on a court order).

*Second*, *Young* also relied heavily on the fact that a court had determined that Young "was wholly innocent of any charge." *Young*, 249 F.3d at 736. Here, though, no judge or law-enforcement officer told the ADC that Shields-Nordness was *innocent*.[3] To the contrary, Commander Johnson notified the ADC that Shields-Nordness could be released *pending further investigation*. A RPFI form is not a certification of factual innocence; oftentimes, an individual who is released pending further investigation is later rearrested and convicted. *See, e.g.*, *United States v. Jones*, 559 F.3d 831, 833-34 (8th

---

[3]Shields-Nordness contends that her boyfriend attempted to persuade ADC employees of her factual innocence by showing them photographs of her car parked near his home in Minneapolis. *See* ECF No. 39 at 17. But there is an enormous difference between, on the one hand, a boyfriend of a detainee claiming that she is innocent and showing photographs of an unknown car at an unknown location to a busy jailer and, on the other hand, a judge making a formal finding that a detainee is innocent. *Cf. Richards v. City of New York*, 433 F. Supp. 2d 404, 419 (S.D.N.Y. 2006) ("The police are not required to believe a suspect's version of the events . . . .").

Cir. 2009) (describing how a defendant was arrested for drug crimes, released pending further investigation, and then subsequently re-arrested and convicted); *United States v. West*, 19 F. App'x 448, 449 (8th Cir. 2001) (same).

*Third*, the strip search of Shields-Nordness was not as intrusive as the strip search of Young. Shields-Nordness was strip searched in a private room with only a single guard present; Young was strip searched "in front of five or six other people." *Young*, 249 F.3d at 736. "The question whether a sexually invasive search is conducted in a private or a public setting is 'especially relevant' to [the] determination of reasonableness." *United States v. Edwards*, 666 F.3d 877, 883 (4th Cir. 2011) (quotation omitted). "The wider an audience for a strip search, the more humiliating it becomes, especially when the stripped individual is exposed to bystanders who do not share the searching officers' institutional need to view her unclothed." *Williams v. City of Cleveland*, 771 F.3d 945, 953 (6th Cir. 2014).

*Finally*, in the years following *Young*, the Eighth Circuit and this Court considered a large number of cases that challenged the "over-detention" of inmates by detention centers. In these cases, the inmate argued that his constitutional rights had been violated when the detention center continued to detain him for hours (or days) after being notified that the inmate was entitled to be released. With one exception,

none of these challenges was successful.[4]  More to the point, the Eighth Circuit also

considered challenges brought by detainees who claimed that they had been wrongfully

returned to the general population after they had been transported to court and a judge

determined that they were entitled to be released.  The Eighth Circuit quickly rejected

those challenges by concluding that the decision to return the detainee to custody either

did not shock the conscience or could not trigger municipal liability.  *See, e.g., Lund v.*

*Hennepin Cty.*, 427 F.3d 1123 (8th Cir. 2005); *Killingham v. Cty. of Hennepin*, 152 F. App'x

554 (8th Cir. 2005); *Russell v. Hennepin Cty.*, 420 F.3d 841 (8th Cir. 2005).  None of these

decisions directly contradicted *Young*, but they did muddy the waters.

Given the significant differences between *Young* and this case—and given the

post-*Young* case law of the Supreme Court, the Eighth Circuit, and this Court—the

_____

[4]*See, e.g., Oertwig v. Hennepin Cty.*, 162 F. App'x 683 (8th Cir. 2006); *Heryla v.
Hennepin Cty.*, 162 F. App'x 676 (8th Cir. 2006); *Stepnes v. Hennepin Cty.*, 153 F. App'x
410 (8th Cir. 2005); *Golberg v. Hennepin Cty.*, 417 F.3d 808 (8th Cir. 2005); *Luckes v. Cty. of
Hennepin*, 415 F.3d 936 (8th Cir. 2005); *Dye v. Cty. of Hennepin*, No. 03-CV-4894
(DWF/SRN), 2005 WL 113561 (D. Minn. Jan. 18, 2005); *Sizer v. Cty. of Hennepin*, 393 F.
Supp. 2d 796 (D. Minn. 2005).  The only exception appears to be *Davis v. Hall*, 375 F.3d
703 (8th Cir. 2004), in which a defendant was held for *57 days* after he entered an *Alford*
plea, the judge essentially sentenced him to time served, and the judge explicitly
ordered that he be released from custody immediately.

These cases make it clear that Shields-Nordness cannot recover for the mere
delay in releasing her.  In other words, if Shields-Nordness had not been strip searched
and transferred to the general population, but instead had merely been required to sit in
the open-booking area until being released at 8:51 am, she would not have a viable
constitutional claim arising out of her "over-detention."

Court cannot find that Shields-Nordness had a clearly established right not to be transferred into the general population. Consequently, the ADC employees are entitled to qualified immunity, and the Court dismisses the federal claims against them with prejudice.

### 2. Section 1983 Claim against Ramsey County

Assuming (without deciding) that Shield-Nordness's constitutional rights were violated by one or more employees of the ADC, Ramsey County cannot be held vicariously liable for that violation. But Ramsey County can be held directly liable if it caused the employees to violate Shields-Nordness's rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). To hold Ramsey County directly liable, Shields-Nordness must prove that "the moving force of the constitutional violation" was a policy or custom of Ramsey County. *Id.* at 694.

Shields-Nordness alleges that Ramsey County adopted a policy that requires every person brought to the ADC to complete the full booking process—including being strip searched and admitted into the general population—even if the ADC learns in the course of the booking process that the person is entitled to be released. Am. Compl. ¶¶ 71, 73. Shields-Nordness further alleges that this policy caused ADC employees to deprive her of substantive due process.

To plead a viable substantive-due-process claim against Ramsey County, Shields-Nordness must plausibly allege (1) that Ramsey County "violated one or more fundamental constitutional rights" and (2) that the conduct of Ramsey County was "shocking to the 'contemporary conscience.'" *Flowers v. City of Minneapolis*, 478 F.3d 869, 873 (8th Cir. 2007) (quoting *Lewis*, 523 U.S. at 847 n.8). In order to prove that a defendant's conduct was conscience-shocking, a plaintiff usually must prove that the defendant acted with the intent to harm. *Truong v. Hassan*, 829 F.3d 627, 631 (8th Cir. 2016). In some cases, however, "proof of deliberate indifference, an intermediate level of culpability, will satisfy this substantive due process threshold." *Id.* Specifically, "[i]n situations where a state actor is afforded a reasonable opportunity to deliberate various alternatives prior to electing a course of action, the chosen action will be deemed 'conscience shocking' if the action was taken with 'deliberate indifference.'" *Neal v. St. Louis Cty. Bd. of Police Comm'rs*, 217 F.3d 955, 958 (8th Cir. 2000).

The adoption of an official governmental policy is the quintessential situation in which "actual deliberation is practical." *Lewis*, 523 U.S. at 851. Thus, courts generally apply the deliberate-indifference standard in deciding whether a municipality's adoption of a policy shocked the conscience. *See, e.g., Hayes v. Faulkner Cty.*, 388 F.3d 669, 674 (8th Cir. 2004) (applying the deliberate-indifference standard to determine

whether the county's prison policy violated the detainee's substantive-due-process rights).

"A policy is deliberately indifferent to a person's constitutional rights when its inadequacy is both obvious and likely to result in the alleged deprivation of constitutional rights." *Russell*, 420 F.3d at 847. A municipality need not be subjectively aware that its policy is constitutionally infirm. *See Walton v. Dawson*, 752 F.3d 1109, 1117 (8th Cir. 2014) ("[A]s applied to a municipality in the Fourteenth Amendment context, 'deliberate indifference' is purely objective: 'liability [may] be premised on obviousness or *constructive notice*.'" (quotation omitted)). At the same time, a municipality "cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established." *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 393 (8th Cir. 2007) (en banc).[5] That is "because a municipality cannot *deliberately*

_____

[5]In *Szabla*, the Eighth Circuit was addressing a claim that a municipality should be held liable because it adopted a policy that was constitutional on its face but that "fail[ed] to give detailed guidance that might have averted a constitutional violation" by a municipal employee. *Szabla*, 486 F.3d at 392. Municipal liability attaches in such a case only when a "city's inaction reflects a deliberate indifference to the constitutional rights of the citizenry . . . ." *Id.* The Eighth Circuit explained that a municipality cannot act with deliberate indifference to constitutional rights that have not yet been clearly established. *Id.* at 393-94.

Here, by contrast, Shields-Nordness is alleging that the conduct of Ramsey County in adopting a facially unconstitutional policy was conscience-shocking and therefore deprived her of substantive due process. In order to hold Ramsey County liable, however, Shields-Nordness must establish that Ramsey County acted with

(continued...)

shirk a constitutional duty unless that duty is clear." *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 995 (6th Cir. 2017) (citing *Szabla*, 486 F.3d at 393).

The Court has already held that, if Shields-Nordness had a constitutional right not to be strip searched and transferred to the general population, that right was not clearly established. In light of that fact, Ramsey County could not have "exhibit[ed] fault rising to the level of *deliberate* indifference to [that] constitutional right . . . ." *Szabla*, 486 F.3d at 393. Because Shields-Nordness has not plausibly pleaded deliberate indifference, she has not plausibly pleaded conduct that would shock the conscience—and because she has not plausibly pleaded conduct that would shock the conscience, she has not plausibly pleaded that Ramsey County deprived her of substantive due process. For that reason, her substantive-due-process claim against Ramsey County is dismissed.

### b. Fourth Amendment

As a general matter, it is easier to establish that a municipal policy violates the Fourth Amendment than it is to establish that a municipal policy violates substantive due process. After all, to establish that a municipal policy violates the Fourth

---

[5](...continued)
deliberate indifference to her constitutional rights. Thus, *Szabla*'s reasoning appears to apply with equal force in this context: Ramsey County could not have acted with deliberate indifference to a constitutional right of Shields-Nordness unless that right had been clearly established.

Amendment, a plaintiff need prove only that a municipality policy is unreasonable; she does not have to go further and prove that the municipality acted with deliberate indifference in adopting the policy. *Szabla*, 486 F.3d at 390. To establish that a municipal policy violates substantive due process, by contrast, a plaintiff must prove that the policy shocks the conscience, which generally requires a showing of deliberate indifference.

For some reason, Shields-Nordness did not plead (or plead clearly) a Fourth Amendment *search* claim against Ramsey County in her amended complaint. In other words, she did not plead that she was *searched* in violation of the Fourth Amendment pursuant to a policy requiring that all ADC detainees—including those who have been arrested for minor offenses and those who, during the booking process, become entitled to release—be strip searched and transferred to the general population. Shields-Nordness should have no difficulty pleading a plausible Fourth Amendment search claim. After all, eight Justices of the Supreme Court agreed that it is an open question whether it is "reasonable to conduct a full strip search of an arrestee whose detention has not been reviewed by a judicial officer and who could be held in available facilities apart from the general population." *Florence*, 566 U.S. at 341 (Alito, J., concurring); *see also Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 289-90 (D.D.C. 2011) (holding that a detention facility violated the Fourth Amendment when it strip searched detainees

and returned them to the general population after the detainees had been taken to court, ordered released by the court, and taken back to the detention facility for processing, given that the detention facility "ha[d] other alternatives . . . such as segregating court returns entitled to release in a separate area of the jail . . . .").

Because this case is still in its infancy, and because the facts pleaded in the amended complaint state a plausible Fourth Amendment claim against Ramsey County, the Court will give Shields-Nordness leave to file a second amended complaint in which she may assert a Fourth Amendment claim challenging her strip search and her transfer into the general population.

### 3. False-Imprisonment Claim

Shields-Nordness alleges that Ramsey County and the ADC employees (along with the St. Paul defendants) are liable under Minnesota law for false imprisonment. The Ramsey County defendants argue that, in the event that the federal claims are dismissed, the Court should decline to exercise supplemental jurisdiction over this state-law claim. But the Court has not dismissed all of the federal claims. Shields-Nordness continues to assert federal claims against the St. Paul defendants, and Shields-Nordness will undoubtedly be filing a second amended complaint asserting a Fourth Amendment claim against Ramsey County.

Ramsey County and the ADC employees also argue that Shields-Nordness's false-imprisonment claim should be dismissed on the merits because a jailer cannot be held liable if he or she "acts 'in reliance upon a commitment fair and valid on its face and issued by a court.'" *Lopez v. Minnesota Vikings Football Stadium, LLC*, No. 17-CV-1179 (PAM/TNL), 2018 WL 2976000, at *4 (D. Minn. June 12, 2018) (quotation omitted).[6] Although no "court" ordered that Shields-Nordness be detained, the Ramsey County defendants claim that they nevertheless had "express legal authority and responsibility" to detain Shields-Nordness after St. Paul police transferred her into their custody. ECF No. 27 at 23-24.

The Court is not so sure. The Court does not doubt that the ADC initially had authority to detain Shields-Nordness after she was arrested by St. Paul police and brought to the ADC. But not long after she arrived, Commander Johnson sent the RPFI form to the ADC. At that point, according to Shields-Nordness, the ADC no longer had authority to detain her. The record simply does not allow the Court to determine whether Shields-Nordness is correct. The Court will therefore deny the motion to

_____

[6]The ADC employees did not move to dismiss the false-imprisonment claim under Minnesota's common-law doctrine of official immunity, which generally shields public officials from being held personally liable for actions that required the exercise of judgment or discretion, unless the public official acted willfully or maliciously. *See AP ex rel. Peterson v. Anoka-Hennepin Indep. Sch. Dist. No. 11*, 538 F. Supp. 2d 1125, 1148-50 (D. Minn. 2008). Moreover, Ramsey County did not move to dismiss the false-imprisonment claim under the doctrine of vicarious official immunity, which extends official immunity to public entities under some circumstances. *See id.* at 1150-51.

dismiss this claim. After a record is developed regarding when the RPFI form was received, what the RPFI form said, and how RPFI forms function, the Ramsey County defendants can again move to dismiss the false-imprisonment claim.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT the Ramsey County defendants' motion to dismiss [ECF No. 25] is GRANTED in part and DENIED in part as follows:

1.    The motion is GRANTED with respect to Counts II and III, and those counts are DISMISSED WITH PREJUDICE.

2.    The motion is DENIED WITHOUT PREJUDICE with respect to Count V.

3.    Plaintiff is granted leave to amend her complaint to plead a § 1983 claim against Ramsey County premised on the claim that a policy or custom of Ramsey County caused ADC employees to subject her to a strip search and transfer her to the general population in violation of the Fourth Amendment.

Dated: March 1, 2019                                     s/Patrick J. Schiltz
                                                          Patrick J. Schiltz
                                                          United States District Judge